# EXHIBIT "C"

Exhibit C  Page 194

# EXHIBIT "C-1"

Exhibit C-1 Page 195

LEXSEE 2008 U.S. DIST. LEXIS 44863

**JERRI L. DUNN, Plaintiff, -vs- HARRIS CORPORATION and FIDELITY EM-PLOYER SERVICES COMPANY, LLC, Defendants.**

**Case No. 6:07-cv-1526-Orl-28DAB**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

**2008 U.S. Dist. LEXIS 44863**

**June 6, 2008, Decided**
**June 6, 2008, Filed**

**PRIOR HISTORY:** Taylor v. Cox, 2008 U.S. Dist. LEXIS 44895 (M.D. Fla., June 6, 2008)

**COUNSEL:** [*1] For Jerri L. Dunn, an individual, Plaintiff: Herbert M. Hill, LEAD ATTORNEY, Herbert M. Hill, PA, Orlando, FL.

For Harris Corporation, a foreign corporation, Defendant: Ralph C. Losey, LEAD ATTORNEY, Stephanie A. Segalini, LEAD ATTORNEY, Akerman Senterfitt, Orlando, FL.

For Fidelity Employer Services Company LLC, a foreign corporation, Defendant: Kathy Massing, LEAD ATTORNEY, Russell Scott Buhite, LEAD ATTORNEY, Fowler, White, Boggs & Banker, PA, Tampa, FL.

**JUDGES:** JOHN ANTOON II, United States District Judge.

**OPINION BY:** JOHN ANTOON II

**OPINION**

**ORDER**

Plaintiff Jerri L. Dunn ("Ms. Dunn") initiated the instant action under the Employment Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), on September 25, 2007 by filing a Complaint (Doc. 1) against Harris Corporation ("Harris"). In December 2007, she filed an Amended Complaint (Doc. 18) adding Fidelity Employer Services Company, LLC ("Fidelity") as a Defendant. Now pending before the Court are the motions to dismiss filed by both Defendants and the motion to consolidate filed by Ms. Dunn.

I. Background

Ms. Dunn asserts that she is one of the designated beneficiaries of the 401(k) plan funds of one of Harris's former employees, Buddy Cox ("Buddy"), who died [*2] on March 25, 2005. After Buddy's death, Ms. Dunn and one of Buddy's daughters, Sharon Taylor ("Ms. Taylor"), each claimed to be a 50% beneficiary of Buddy's plan funds based on an unsigned beneficiary designation form that was received by Fidelity or Harris in April 2001. However, also on file was a signed beneficiary designation form dated August 1990 specifying that 100% of the Plan funds were left to Buddy's son, Thomas Cox ("Dr. Cox").

Faced with the two competing claims to the funds - one by Ms. Dunn and Ms. Taylor and one by Dr. Cox - Harris's Employee Benefits Committee ("the Committee") initially determined that the first, signed beneficiary form was effective and not superseded by the second, unsigned form; thus, the Committee determined that the funds should go to Dr. Cox. Ms. Dunn asked for an administrative review of that determination. Rather than review Ms. Dunn's appeal, in September 2005 the Committee filed an interpleader action in this Court - Case No. 6:05-cv-1388 [hereinafter Dunn I] - seeking to have this Court determine the proper beneficiary. The Court abated that action and directed the Plan administrator to resolve Ms. Dunn's appeal. In June 2006, the Committee [*3] resolved the appeal, reaffirming its determination that the funds should be awarded to Dr. Cox.

In August 2006, Harris moved to reopen Dunn I and renewed its motion for interpleader, seeking to interplead the benefit funds and be dismissed from the case. No responses to that motion were filed, and in September 2006 this Court adopted the magistrate judge's recommendation - to which no objections were interposed - that the motion for interpleader be granted and that Har-

Exhibit C-1 Page 196

ris be dismissed from active participation in the case, with jurisdiction retained over Harris only with regard to management of the funds pending resolution of the case. The parties in Dunn I were then realigned, with Ms. Dunn and Ms. Taylor designated as plaintiffs and Dr. Cox designated as the defendant. The parties were advised at that time that the Case Management and Scheduling Order that had been entered earlier in the case governed and that if any party wished to seek amendment of it, he or she could file a motion to that effect.

More than four months later, on January 26, 2007, Ms. Dunn, through a new attorney, requested leave to file an amended Answer to add a "third-party claim" against Harris for breach of fiduciary [*4] duty based on its handling of the unsigned beneficiary designation form. (Doc. 62 in Dunn I). [1] In that motion, Ms. Dunn's new counsel "acknowledge[d] that the claim made the subject of this [m]otion should probably have been pressed at an earlier date and ha[d] no explanation to offer as to why Plaintiff's former counsel did not do so." (Id. at 4). That same day, Ms. Dunn moved for leave to amend the Case Management and Scheduling Order, pursuant to which the deadline for amendment of pleadings, April 2006, had long passed. (Doc. 63 in Dunn I). As grounds for the requested leave to amend the scheduling order, Ms. Dunn stated that "there are new scheduling issues which will arise in the event the Leave to Amend [the Answer] requested by Plaintiff Dunn in a motion filed on even date herewith [is granted]." (Id. at 2). Ms. Dunn also moved to extend the mediation deadline. (Doc. 72 in Dunn I). The Court granted the extension of the mediation deadline and denied the motions for leave to amend without prejudice. (Order, Doc. 73 in Dunn I).

> 1   In the proposed Amended Answer and Third Party Claim attached to the motion for leave to amend, Ms. Dunn asserted:
>
>> Plaintiff Dunn is entitled to recovery [*5] of the death [sic] benefits . . . pursuant to the Beneficiary Designation Form . . . on the grounds that the allegedly defective Beneficiary Designation Form is in substantial compliance with the requirements necessary to give it full force and effect . . . .
>>
>> Alternatively, Third Party Defendant Harris is liable to Plaintiff for damages in the amount of the death [sic] benefits to which she otherwise would have been entitled had the Benefi-

ciary Designation Form been properly handled by Third Party Defendant Harris in compliance with the fiduciary obligations under which that entity was acting in the matter.

(Proposed Am. Answer, Attach. to Doc. 62 in Dunn I, at 8).

The parties mediated Dunn I in May 2007 but were unable to resolve it. Ten days later, Ms. Dunn filed an unopposed motion to abate the case so that the parties could continue informal negotiations to resolve the matter. The Court granted that motion, removed the case from the September 2007 trial calendar, and ordered the parties to file a status report by September 15, 2007. In August 2007, Dr. Cox moved to lift the abatement because negotiations had failed. The magistrate judge granted that motion in part and set a case management [*6] conference for September 24, 2007.

On September 21, 2007, Ms. Dunn filed a second motion for leave to amend her answer, again seeking leave to add a breach-of-fiduciary claim against Harris. (Doc. 86 in Dunn I). The magistrate judge denied that motion on September 25, 2007, stating that "[a]ny claim against the dismissed Plaintiff (Harris Corporation) must proceed in separate litigation." (Order, Doc. 88 in Dunn I). The case was set on the January 2008 trial calendar. (Id.)

The same day that the magistrate judge denied Ms. Dunn's second motion to amend her answer in Dunn I, Ms. Dunn filed the instant case, Case No. 6:07-cv-1526, against Harris. In her Complaint, Ms. Dunn claimed entitlement to Buddy's 401(k) benefits based on the second, unsigned beneficiary designation form and, as she had in her proposed amended answer in Dunn I, alternatively alleged that "Harris is liable to Plaintiff Dunn for damages in the amount of the death benefits to which she otherwise would have been entitled had the Beneficiary Designation Form been properly handled." (Compl. PP 24 & 25).

Harris filed a Motion to Dismiss (Doc. 14), contending that Ms. Dunn's Complaint failed to state a claim for which relief [*7] can be granted and that it is procedurally barred because her claim is a compulsory counterclaim that should have been timely brought in Dunn I. On December 14, 2007, Ms. Dunn filed an Amended Complaint (Doc. 18) adding Fidelity as a defendant. In the Amended Complaint, Ms. Dunn recharacterizes her allegations somewhat. She no longer refers to the requested relief as "damages," instead asserting that "[i]n the event [she] does not prevail in her claims in

Exhibit C-1  Page 197

2008 U.S. Dist. LEXIS 44863, *

[Dunn I], pursuant to the provisions of 29 U.S.C.[] § 1132(a)(1)(B), Plaintiff Dunn is entitled to recover from Defendants the [401(k) plan] benefits . . . or, alternatively, to a declaration of her rights to said benefits." (Doc. 18 P 31). Alternatively, she seeks, in the event that she *does* prevail in Dunn I, attorney's fees that she has incurred in securing those benefits. (Doc. 18 P 32).

The same day that Ms. Dunn field her Amended Complaint, she also filed a motion in Dunn I for "reconsideration and bifurcation" - again seeking leave to amend her answer to add a claim against Harris, citing Harris's assertion of the "compulsory counterclaim" argument in this second case. On January 4, 2008, Harris asked that this Court consider [*8] its arguments in the motion to dismiss with regard to the Amended Complaint rather than the initial Complaint. (Doc. 23). On January 28, 2008, Fidelity filed its Motion to Dismiss (Doc. 26) the Amended Complaint, urging that it fails to state a claim for which relief can be granted.

A bench trial was held in Dunn I on January 29, 2008, and the Court took the matter under advisement. On February 28, 2008 - a month after the trial in the first case - Ms. Dunn filed a Motion to Consolidate (Doc. 40) in this, the second case, stating:

> 1. The underlying transaction and facts of the two (2) cases are identical. The outcome of *Dunn I* has a substantial and material impact on the nature of the claims made in the instant cause of action.
>
> . . . .
>
> 3. Defendant Harris Corporation has interposed a defense in the instant cause of action that [the] claims asserted herein constituted compulsory counterclaims in *Dunn I.* It is respectfully suggested that such a defense would be obviated by the granting of the instant motion. Plaintiff Dunn should not be placed in the impossible procedural posture that leave is not granted to assert counterclaims in *Dunn I* when a Defendant herein is asserting that she had [*9] the obligation to assert those claims in *Dunn I.*
>
> 4. There will be no prejudice to any party i[f] the relief requested herein is granted. The underlying claims in *Dunn I* have already been tried. There will be no delay to pre-trial process in the instant cause of action caused by allowing Plaintiff the relief necessary to ensure that her claims do not turn on procedural issues rather than the substance thereof.

(Doc. 40 at 1-2). In an order entered today in Dunn I, this Court determined, as had the Harris Committee, that Dr. Cox is the rightful beneficiary of the 401(k) plan funds.

II. Discussion

A. The Motions to Dismiss

In their motions to dismiss (Doc. 43 & 44), Harris and Fidelity raise both substantive and procedural arguments for dismissal of Ms. Dunn's claims against them. Defendants are correct in both respects; Ms. Dunn does not have a viable claim against them, and even if she did, she was required to have timely pursued it in the prior case.

*1. Ms. Dunn cannot state a cause of action against Harris or Fidelity*

It is well-settled that ERISA provides civil enforcement mechanisms that preempt other causes of action relating to employee benefit plans. Thus, any cause of action that Ms. [*10] Dunn can bring against Harris must be an ERISA claim of some type. In the Amended Complaint, Ms. Dunn purports to bring a claim under 29 U.S.C. § 1132(a)(1)(B), [2] seeking - if she does not prevail in Dunn I [3] - "to recover [Buddy's 401(k)] benefits." (Doc. 18 P 31). Ms. Dunn is incorrect.

> 2    As noted by Harris in its motion (Doc. 14), in the initial Complaint (Doc. 1) Ms. Dunn did not identify the section under which she was bringing her claim. In the Amended Complaint and in her opposition papers, however, she clarifies that she is bringing a "claim for benefits" under 29 U.S.C. § 1132(a)(1)(B).
>
> 3    Ms. Dunn alternatively contends that if she does prevail in Dunn I, "Defendants are liable to Plaintiff Dunn for the attorney's fees she has incurred in securing said benefits." (Id. P 32). However, this argument is moot in light of Ms. Dunn's failure to prevail in Dunn I. Moreover, she has not explained why she could have not sought fees in Dunn I in the event she prevailed.

The section under which Ms. Dunn purports to bring her claim - 29 U.S.C. § 1132(a)(1)(B), provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the [*11] terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The issue of the "correct" beneficiary of Buddy's 401(k) plan benefits, however, has already been put before the Court in Dunn I. The case was initiated by Harris as an interpleader action, but

Exhibit C-1 Page 198

it nonetheless is the case in which the benefits determination is to be made. There cannot be a "second" benefits determination after the determination in that case is made, especially considering that Ms. Dunn agreed to proceed with the determination of the rightful beneficiary in that case. Ms. Dunn's assertions to the contrary are not well-taken. [4]

> 4 At one point in her opposition memorandum, Ms. Dunn states:
>
>> Even if *Dunn I* is also a claim for those benefits, this fact does not preclude pursuit of this action against Defendant Harris. If it comes to pass that the adjudication of *Dunn I* results in [Dunn] securing the benefits sought herein, then Defendant Harris can interpose that result as a defense on the grounds that Plaintiff should not be allowed to recover twice, but not on the basis that Defendant Harris should not have to pay twice. If the result [*12] of *Dunn I* is that Plaintiff does not recover the benefits to which she is entitled herein, then this cause of action proceeds to judgment on Plaintiff's claim under § 502(a)(1)(B).

(Doc. 35 at 7). This position is not well-founded, however.

Ms. Dunn has repeatedly characterized her claim based on the handling of the second beneficiary form as "a claim for benefits" based on a breach of fiduciary duty. However, there is no such cause of action - it is either a claim for benefits or it is not. See, e.g., Hartman v. Wilkes-Barre Gen. Hosp., 237 F. Supp. 2d 552, 557 (M.D. Pa. 2002) ("ERISA sets forth who is empowered to bring a civil action. Courts have interpreted ERISA to mean that a plaintiff cannot sue for breach of fiduciary duties to obtain denied benefits."). To the extent that the handling of the unsigned beneficiary designation form - i.e., the fact that it was not returned to Buddy during his lifetime for clarification of his intent - bears on the question of who is the correct beneficiary, the Court already considered it in Dunn I. Thus, Ms. Dunn's "claim for benefits" based on mishandling (or nonhandling) of the form has already been considered.

Ms. Dunn does not purport to assert [*13] any claim other than a "claim for benefits," and even if she

had done so her claim would fail because she has no other cause of action under ERISA available to her. First, her claim is not viable under ERISA's "breach of fiduciary duty" section. ERISA's civil enforcement provision states that "[a] civil action may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title," 29 U.S.C. § 1132(a)(2), and section 1109 in turn provides for "[l]iability for breach of fiduciary duty." 29 U.S.C. § 1109. However, section 1109 does not provide a remedy to Ms. Dunn.

Section 1109 provides in pertinent part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to *make good to such plan* any losses *to the plan* resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which may have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a) [*14] (emphasis added). This section has been interpreted by the United States Supreme Court as meaning "that recovery for [its violation] inures to the benefit of the plan as a whole" rather than to an individual. Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985); accord Estate of Mattern v. Honeywell Int'l, Inc., 241 F. Supp. 2d 540, 543 (D. Md. 2003) (finding breach of fiduciary claim based on alleged failure of administrator to timely make a lump sum distribution or to advise "of the importance of a completed beneficiary designation" was not appropriately brought under § 1132(a)(2); plaintiffs "requested no relief that would inure to the benefit of the plan"); Hartman, 237 F. Supp. 2d at 557 ("Plaintiff is seeking relief for herself, not the plan; therefore, [section 1109(a), through section 1132(a)(2),] does not provide her with the ability to raise a breach of fiduciary duty cause of action"); Metro. Life Ins. Co. v. Palmer, 238 F. Supp. 2d 826, 830 (E.D. Tex. 2002) (noting law of the Fifth Circuit that "a potential beneficiary may not sue for breach of fiduciary duty if he has a pending claim under section 1132(a)(1)(B) for benefits allegedly owed" and that "even if [the [*15] claim for benefits] is unsuccessful, that would not make this alternative claim for equitable relief viable"). Ms. Dunn's claim would not inure to the benefit of the plan as a whole, and thus she has no cause of action under § 1132(a)(2).

The Supreme Court's recent decision in LaRue v. DeWolff, Boberg & Associates, Inc., 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) - submitted by Ms. Dunn as supplemental authority (see Doc. 41) - does not alter this result. In LaRue, the Court, after noting the Russell holding "that a participant in a disability plan that paid a fixed level of benefits [cannot] bring suit under [section 1132(a)(2)] to recover consequential damages arising from delay in the processing of her claim," examined the issue of "whether [section 1132(a)(2)] authorizes a participant in a defined contribution pension plan to sue a fiduciary whose alleged misconduct impaired the value of plan assets in the participant's individual account." 128 S. Ct. at 1022. Refining Russell to some extent, the LaRue Court held "that although [section 1132(a)(2)] does not provide a remedy for individual injuries apart from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the [*16] value of plan assets in a participant's individual account." Id. at 1026.

LaRue does not benefit Ms. Dunn. The Court's holding was based on the "changed landscape" of employee benefit plans, which now, the Court noted, is dominated by defined contribution plans rather than defined benefit plans. See id. at 1025. The LaRue Court held that a suit for losses to an account could go forward in the defined contribution plan context even though only an individual account was affected rather than the whole plan. This holding does not mean that an alleged beneficiary like Ms. Dunn can seek benefits based on a breach of fiduciary duty or bring a breach of fiduciary duty claim after being found not to be the rightful beneficiary.

Finally, the only other ERISA provision under which Ms. Dunn could potentially bring suit [5] is 29 U.S.C. § 1132(a)(3), but she does not have a claim under this section either. This section provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations [*17] or (ii) to enforce any provisions of this subchapter or the terms of the plan." The relief Ms. Dunn seeks is not equitable in nature, and thus she does not have a cause of action under § 1132(a)(3). See, e.g., Kmatz v. Metro. Life Ins. Co., 232 Fed. Appx. 451, 457 (6th Cir. 2007) ("The estate has already raised - and lost - a denial-of-benefits claim under § 1132(a)(1). . . . Neither § 1132(a)(2) nor [1132(a)(3)] supplies the sort of remedy that the estate seeks - money damages."); Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 615 (6th Cir. 1998) (noting that the Supreme Court has "limited the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies" and that where claimant had

available to him "a lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)" and where "the district court reviewed his claim de novo and concluded that [the] denial of benefits was correct" the plaintiff "has no cause of action under any other subsection of § 1132") (citing Varity Corp. v. Howe, 516 U.S. 489, 512, 515, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)); [*18] Hartman, 237 F. Supp. 2d at 557 ("This section [§ 1132(a)(3)] is also inappropriate for the plaintiff. She is seeking payment of benefits that she claims are due to her. . . . [A] claim for money due and owing is not equitable relief and does not fall under this section."); Roig v. Te. Ltd. Long Term Disability Program, No. CIV.A. 99-2460, 2000 U.S. Dist. LEXIS 11379, 2000 WL 1146522, at *10 (E.D. La. Aug. 4, 2000) ("Plaintiff's breach of fiduciary duty claim is merely a disguised claim for failure to pay benefits. The only damages she seeks to recover are benefits allegedly due, along with interest, reasonable attorney's fees[,] and costs. These remedies are all available to her under section 1132(a)(1)(B), and the Plan is properly before the Court. Because section 1132(a)(1)(B) provides an appropriate remedy, plaintiff's breach of fiduciary [duty] claim is not viable under section 1132(a)(3)."); Strohmeyer v. Metro. Life Ins. Co., No. 3:04cv1808(WWE), 2005 U.S. Dist. LEXIS 42499, 2005 WL 3963770, at *2 (D. Conn. Nov. 15, 2005) ("[C]ompensatory damages or monetary relief for all losses sustained as a result of alleged wrongful conduct are not recoverable under section 1132(a)(3).").

  5    The other provisions of ERISA's civil enforcement section, [*19] 29 U.S.C. § 1132(a), clearly do not apply here.

In sum, Ms. Dunn has no claim against Harris or Fidelity other than a claim for benefits. To the extent the handling of the unsigned beneficiary form bears on the question of whether Ms. Dunn (along with Ms. Taylor) or Dr. Cox is the rightful claimant to Buddy's 401(k) benefits, the handling of the form has already been considered in the beneficiary determination in Dunn I. And, although she does not purport to bring a claim for breach of fiduciary duty under § 1132(a)(2) or a claim for "other relief" under § 1132(a)(3), even if she had attempted to bring such claims they would fail for the reasons set forth above. Thus, the motions to dismiss are due to be granted for failure to state a claim on which relief can be granted.

*2. Even if Ms. Dunn had a cause of action, she was required to bring it in Dunn I*

Even if Ms. Dunn had a cause of action under the statute apart from the beneficiary dispute at issue in Dunn I, her claim would nevertheless be procedurally

Exhibit C-1 Page 200

barred by her failure to timely raise such a claim in that earlier litigation. Ms. Dunn argues that it would be unfair to preclude her from bringing this second suit after her requests [*20] to amend were denied in Dunn I, but she is mistaken.

The procedural history of Dunn I is somewhat convoluted. The case was brought by Harris as an interpleader action when it was in doubt about to whom it should pay the benefits. The Court abated the action so that Harris could "finish what it started" and resolve the administrative appeal Ms. Dunn raised; in abating the action, the Court advised the parties that "upon final resolution, any party may return to this Court upon proper motion and seek review of the decision." (Order, Doc. 51 in Dunn I, at 1-2). When the administrative committee completed its review and reaffirmed the determination that Dr. Cox was the rightful beneficiary, Ms. Dunn and Ms. Taylor advised Harris that they would not release their claims to the fund, and Harris then moved to reopen the abated case and renewed its motion for interpleader. (See Doc. 56 in Dunn I). No one objected to this motion or to the magistrate judge's Report recommending that it be granted in part and denied in part.

In that Report (Doc. 57 in Dunn I), the magistrate judge stated:

> The Court finds that interpleader is appropriate and the dismissal of [Harris] (without prejudice at this time) [*21] should be granted, conditioned on [Harris's] continued stewardship of the Fund, pending resolution of the competing claims. . . . [T]here is no suggestion that Harris has a personal interest in the Fund for its own use of benefit. Simply put, Harris is not itself a claimant for the Fund and does not dispute that the appropriate beneficiary(s) are among the Defendants. Moreover, . . . no party has filed a response to the motion in opposition to the relief sought, nor are there any counterclaims against Plaintiff, or any other issue which would preclude the withdrawal of Plaintiff. As such, the request for dismissal should be granted.

(Report & Recommendation, Doc. 57 in Dunn I, at 5) (footnote omitted). In a footnote, the Report noted, "Dunn has raised several affirmative defenses such as estoppel and waiver, but these defenses relate to the ultimate issue of the identity of the proper beneficiary[,] an issue which Harris now claims no interest in. While the factual circumstances of the case no doubt suggest that

Harris, the Committee and perhaps Fidelity employees may be called upon as witnesses in this litigation, the Court sees no reason to compel Harris to remain a party, if it does [*22] not wish to be so." (Id. at 5 n.6). No objections to the Report were filed, and this Court adopted it, granted the interpleader motion, and dismissed Harris from the case without prejudice, remaining subject to this Court's jurisdiction only with regard to maintenance of the funds. (Order, Doc. 58 in Dunn I).

Not until four months later did Ms. Dunn attempt to add a "counterclaim" against Harris based on its alleged breach of fiduciary duty in connection with the unsigned beneficiary designation form. Ms. Dunn's attempted assertion of this claim for the first time in January 2007 was both late and improper.

The very point of interpleader is to avoid multiple suits and resolve multiple claims to a fund. "Interpleader's primary purpose is not to compensate, but rather to protect stakeholders from multiple liability as well as from the expense of multiple litigation." Aetna Life Ins. Co. v. Bayona, 223 F.3d 1030, 1034 (9th Cir. 2000). Harris moved for interpleader in the first case so the Court could determine the beneficiary of "the stake" - Buddy's 401(k) benefits. No one - including Ms. Dunn - objected to the interpleader, even after being put on notice that with the granting of the [*23] interpleader motion Harris would be dismissed as a party to the suit. By not objecting to the interpleader, Ms. Dunn waived her right to pursue claims related to the interpleaded funds. See, e.g., Metro. Life Ins. Co. v. Barretto, 178 F. Supp. 2d 745, 748 (S.D. Tex. 2001) ("Were the defendants in an interpleader action permitted to carry forward with counterclaims against the stakeholder based upon the same interpleaded funds, the very purpose of the interpleader action would be utterly defeated.") (citations and quotation marks omitted). Essentially, interpleader is a call to all claimants to a fund to put forth their claims so that entitlement to the fund can be determined. Ms. Dunn agreed to the interpleader as the means of resolving the competing beneficiary forms, and any claims or arguments related to the fund should have been made in Dunn I.

Although Ms. Dunn contends that injustice would result if the Court does not allow her to proceed in this case after having denied her motion to amend her answer in the first case, the problem - again, assuming that Ms. Dunn had a claim to bring at all - is of Ms. Dunn's own making. If she had a claim to raise with regard to the funds, she [*24] could have raised it in the first case - by objecting to the interpleader or by otherwise filing a claim. She did not do so in a timely fashion, and she even agreed to the trial proceedings going forward in January. A party is not relieved of its obligation to timely raise issues merely by filing a second lawsuit. Even if

Exhibit C-1 Page 201

Ms. Dunn had a viable claim against either Harris or Fidelity, she had to timely pursue it in the first case. Cf. Metro. Life Ins. Co. v. Kubichek, 83 Fed. Appx. 425, 430 (3d Cir. 2003) (finding that claims for breach of fiduciary duty, based on losing or misplacing beneficiary form in which decedent allegedly named claimant as beneficiary, were barred because they "were compulsory counterclaims that should have been asserted in the interpleader action").

B. The Motion to Consolidate

Because the Court has concluded that the motions to dismiss are well-taken and that the action must be dismissed - and because the other case has already been concluded - the motion to consolidate (Doc. 40) is moot and will be denied as such.

III. Conclusion

To the extent Ms. Dunn is seeking to recover "benefits" - as she now purports to be doing - such a claim has already been put at issue [*25] and decided in Dunn I, and in that case the Court considered the fact that the unsigned beneficiary designation form was received by either Harris or Fidelity and was not returned to Buddy. Ms. Dunn may not seek "benefits" again where the issue of who was the rightful beneficiary of those benefits was - with her acquiescence - already tried to the Court in the first suit. Moreover, even if Ms. Dunn couched her claim in other terms - i.e., as a claim for breach of fiduciary

duty or "other equitable relief" - she essentially would be seeking money damages and has no cause of action. The motions to dismiss of both Harris and Fidelity must be granted.

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Harris Corporation's Motion to Dismiss (Doc. 14) is **DENIED as moot** insofar as it is directed at the initial Complaint and is **GRANTED** insofar as the Court construes it, as requested by Harris, as directed at the Amended Complaint (Doc. 18).

2. Defendant Fidelity Employer Service Company's Motion to Dismiss (Doc. 26) is **GRANTED.**

3. Plaintiff's Motion to Consolidate (Doc. 40) is **DENIED as moot.**

4. This case is **DISMISSED.** The Clerk is directed to enter a judgment [*26] providing that Plaintiff Dunn shall take nothing from the Defendants in this action. Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 6th day of June, 2008.

/s/ John Antoon II

JOHN ANTOON II

United States District Judge

Exhibit C-1  Page 202

# EXHIBIT "C-2"

Exhibit C-2  Page 203

LEXSEE 2007 US DIST LEXIS 89971

**METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff-in-Interpleader, v. RACHEL BILLINI; MONIQUE DIAZ; NICOLE DIAZ; PABLO DIAZ; REGINA DIAZ; TIARA DIAZ; and DOES 1 through 10, inclusive, Defendants-in-Interpleader.**

**NO. CIV. S-06-02918 WBS KJM**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 89971**

**November 26, 2007, Decided**
**November 27, 2007, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by Metro. Life Ins. Co. v. Billini, 2008 U.S. Dist. LEXIS 12620 (E.D. Cal., Jan. 15, 2008)

**COUNSEL:** [*1] For Metropolitan Life Insurance Company, Plaintiff: James Christopher Castle, Barger and Wolen LLP (Los Angeles), Los Angeles, CA.

Monique Diaz, Defendant, Pro se, Sacramento, CA.

Nicole Diaz, Defendant, Pro se, Fresno, CA.

Pablo Diaz, Defendant, Pro se, West Sacramento, CA.

Regina Diaz, Defendant, Pro se, West Sacramento, CA.

Tiara Diaz, Defendant, Pro se, West Sacramento, CA.

**JUDGES:** WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** WILLIAM B. SHUBB

**OPINION**

*ORDER RE: PLAINTIFF'S MOTION FOR DISMISSAL OF PLAINTIFF-IN-INTERPLEADER; DISCHARGE; INJUNCTION; AND ATTORNEYS' FEES AND COSTS*

This is an interpleader action involving a dispute over the proceeds of a life insurance policy administered by plaintiff-in-interpleader Metropolitan Life Insurance Company ("MetLife"). MetLife filed this interpleader action after receiving competing claims on the policy from claimants-in-interpleader ("claimants"). Now, MetLife requests this court to 1) dismiss MetLife, with pre-

judice, from the action; 2) discharge MetLife, SBC Communications Inc. ("SBC"), and SBC Benefit Program ("Plan") from further liability to the claimants; 3) enjoin claimants from asserting claims related to the Plan; and 4) award MetLife its attorneys' fees [*2] and costs.

*I. Factual & Procedural Background*

In 1984, decedent enrolled in the Plan, which was a group life insurance policy through his former employer, SBC, that MetLife issued and administered. (Compl. 2:15-16, 21-22.) On August 30, 1994, decedent named his wife, Susan Diaz, as his primary plan beneficiary and designated five children, Pablo Diaz, Monique Diaz, Tiara Diaz, Nicole Diaz, and Regina Diaz ("decedent's children"), as contingent beneficiaries. (*Id.* Ex. A.) Subsequently, decedent and his wife divorced, which automatically revoked the designation in favor of his wife. (*Id.* at 3:3-5, Ex. B.) On March 17, 2005, decedent executed a second form and designated Rachel Billini, who has claimed to be decedent's niece, as the sole beneficiary of his plan benefits. (*Id.* Ex. C.) On April 30, 2005, decedent executed a third form, naming his children as the sole beneficiaries of his plan benefits. (*Id.* Ex. D.)

Decedent passed away on May 3, 2005. The SBC Rules for Employee Beneficiary Designations provide that a beneficiary designation is effective only if the employee is "alive as of the time and date of the receipt of the beneficiary designation." (*Id.* at 3:26-27, Ex. B.) MetLife claims [*3] it received the April 30, 2005 designation form on May 4, 2005, but decedent's children claim the form was sent to MetLife via over-night delivery on May 2, 2005. (*Id.* at 3:23-24; Answer P 13.)

Exhibit *C-2* Page *204*

MetLife recognizes that decedent's death benefit of $ 46,000, plus interest, is payable under the Plan. (Compl. 5:7-8.) On June 24, 2005, it received a claim form from Billini, alleging that she was decedent's niece. (*Id.* Ex. E.) Then, on July 11, 2005, it received claim forms from decedent's children. (*Id.* Ex. F.) In letters to MetLife, decedent's children also stated that they would seek legal recourse if MetLife paid the benefits to Billini. (*Id.* Exs. G, H.)

MetLife did not pay the benefits to Billini or decedent's children because it was uncertain who was entitled to them. (*Id.* at 5:25-26.) The April 30, 2005 designation to decedent's children could be invalid if it was received after May 3, 2005. The May 17, 2005 designation to Billini could also be invalid because, in their letters to MetLife, decedent's children stated that Billini exerted undue influence to persuade decedent to designate Billini as the primary beneficiary and that Billini falsely claimed she was decedent's niece. (*Id.* [*4] at 5:1-5.) If the May 17, 2005 and April 30, 2005 designations are both invalid, MetLife contends that the August 30, 1994 designation would be controlling. (*Id.* at 5:15-16.) Under that designation, decedent's children would be entitled to the benefits.

To avoid double liability, MetLife brought this interpleader action on December 26, 2006. Decedent's children have been served and have filed an answer; however, Billini, who was personally served on April 9, 2007, has not filed an answer. In February, MetLife deposited the policy benefits with this court and now seeks to be dismissed from the action and discharged from liability. MetLife also requests this court enjoin claimants from pursuing additional claims against the policy and award MetLife its attorneys' fees and costs. Neither decedent's children nor Billini filed a responsive pleading to or opposed MetLife's motion.

II. *Discussion*

When a stakeholder of a sum of money is subject to competing claims, an interpleader action allows the stakeholder to sue the various claimants, forcing the claimants to litigate who is entitled to the money. *Cripps v. Life Ins. Co. of N. Am.,* 980 F.2d 1261, 1265 (9th Cir. 1992). Procedurally, an interpleader [*5] action encompasses two stages. "First, the court determines the propriety of interpleading the adverse claimants and relieving the stakeholder from liability. The second stage involves an adjudication of the adverse claims of the defendant claimants." *First Interstate Bank of Or. v. U.S.,* 891 F. Supp. 543, 546 (D. Or. 1995) (citing 3A James Wm. Moore & Jo D. Lucas, Moore's Federal Practice §§ 22.14[1]-[2] (2d ed. 1994) and *Cripps,* 980 F.2d at 1265).

Federal Rule of Civil Procedure 22 allows a stakeholder to bring an interpleader claim when the stakeholder "is or may be exposed to double or multiple liability." Fed. R. Civ. P. 22. In this case, it is undisputed that MetLife was justified in bringing an interpleader action because it received conflicting claims and decedent's children informed MetLife that they would bring a lawsuit if MetLife paid the proceeds of the policy to Billini.

If an interpleader action is properly brought and the funds have been deposited with the court, a court should readily discharge a stakeholder absent bad faith or delay by the stakeholder. *First Interstate Bank of Or.,* 891 F. Supp. at 547; *see generally* 4 James Wm. Moore & Richard D. Freer, *Moore's Federal Practice* § 22.03[2][a]. [*6] Here, MetLife is disinterested in who prevails, has deposited the funds with the court, and none of the claimants have alleged that MetLife has acted in bad faith. Accordingly, the court will dismiss, with prejudice, MetLife from the action and discharge MetLife, SBC, and the Plan from further liability for the Plan benefits. [1]

> 1  MetLife's request to be discharged "from further liability to the named Claimants-in-Interpleader" is too broad. *See State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 533, 87 S. Ct. 1199, 18 L. Ed. 2d 270 (1967) (interpleader action does not entitle a stakeholder "to an order both enjoining prosecution of suits against it outside the confines of the interpleader proceeding" and suits for tortious conduct).

Given the futility of an interpleader action if claimants file separate suits against the stakeholder, the court may enjoin the claimants from doing so. *U.S. v. Major Oil Corp.,* 583 F.2d 1152, 1157-58 (10th Cir. 1978). Again, claimants have not opposed MetLife's request for an injunction and the court can see no reason not to issue it. Therefore, the court will enjoin the claimants from instituting any other proceeding in any state or federal court against MetLife, SBC, or the Plan regarding [*7] the Plan benefits.

"Generally, courts have discretion to award attorney fees to a disinterested stakeholder in an interpleader action." *Abex Corp. v. Ski's Enterprises, Inc.,* 748 F.2d 513, 516 (9th Cir. 1984). "The traditional test for determining attorneys fees in an interpleader action is less rigorous than the more elaborate factors used to consider fee awards in other contexts." *Sun Life Assurance Co. of Canada v. Chan,* 2003 U.S. Dist. LEXIS 16943, 2003 WL 22227881 at *3 (N.D. Cal. 2003) (citations omitted). Fees are generally paid from the policy benefits and the party requesting fees has the burden to establish entitlement to them. *Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415, 427 (9th Cir. 2000).

Exhibit C-2 Page 205

2007 U.S. Dist. LEXIS 89971, *

When the stakeholder requesting fees is an insurance company, interpleader actions offer two distinct benefits. First, "the availability of attorneys' fees for interpleader plaintiffs recognizes that by bringing the action, the plaintiff benefits all parties 'by promoting early litigation on the ownership of the fund, thus preventing dissipation.'" *See id.* at 426 (quoting *Schirmer Stevedoring Co. Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d. 188, 193 (9th Cir. 1962)). Second, interpleader [*8] is a "valuable procedural device" for insurance companies that are faced with competing claims because it provides a way for the insurance companies to "disclaim[] any position as to which of the claimants is entitled to the fund." *Id.*

The latter interest has prompted other courts to deny fees when the stakeholder is an insurance company. *See, e.g., Aetna U.S. Healthcare v. Higgs,* 962 F.Supp. 1412, 1414-15 (D. Kan. 1997); *Sun Life Assurance Co. of Canada v. Thomas,* 735 F.Supp. 730, 733 (W.D. Mich. 1990); *Life Ins. Co. of N. Am. v. Nava,* 667 F.Supp. 279, 280 (M.D. La. 1987); *Mutual of Omaha Ins. Co. v. Dolby,* 531 F.Supp. 511, 517 (E.D. Pa. 1982). In doing so, these courts observe that competing claims "are part of the ordinary course of business for an insurance company" and an interpleader action should not be utilized to transfer these "ordinary business expenses to the claimants." *Mutual of Omaha Ins. Co.,* 531 F.Supp. at 517.

While the Ninth Circuit has not barred recovery of fees and costs when the stakeholder is an insurance company, it has explained that fee awards in interpleader actions are "typically modest," especially because a fee award could "deplete the fund at the expense [*9] of the party who is ultimately deemed entitled to it." *Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415, 426-28 (9th Cir. 2000) (affirming a district court's award of $ 3,000.00 in fees when the stakeholder requested $ 97,000.00). The Ninth Circuit has also explained that, for interpleader plaintiffs, "[c]ompensable expenses include, for example, preparing the complaint, obtaining service of process on the claimants to the fund, and preparing an order discharging the plaintiff from liability and dismissing it from the action." *Id.* at 426-27 (quoting *Schirmer Stevedoring Co. Ltd.,* 306 F.2d at 194 and Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice & Procedure* § 1719 & n.20 (1986))).

In this case, decedent's policy is for $ 46,000.00 and MetLife has requested $ 8,717.82 in fees and costs, which is almost one-fifth of the Plan benefits. In issuing policies and setting premiums, MetLife must anticipate that conflicting claims will arise and that it will routinely be required to incur expenses to investigate and resolve such claims. MetLife would have incurred many of those expenses if it did not file an interpleader action.

Therefore, the court [*10] will award MetLife only the fees and costs it incurred solely because of this interpleader action, which is the $ 2,700.00 incurred to prepare the complaint and this motion and the costs to serve the claimants. [2]

> 2   This amount includes $ 840 to draft the complaint, $ 420 to personally serve Billini (it took two attempts), and $ 1,440 to prepare this motion. The award does not include the fees for counsel's appearance at oral argument on November 26, 2007, since MetLife has a personal interest in appearing at oral argument in order to recover its fees.

IT IS THEREFORE ORDERED that (1) MetLife's motion to be dismissed from this action, with prejudice, be, and the same hereby is, GRANTED; (2) MetLife's motion for MetLife, SBC, and the Plan to be discharged from further liability for the Plan benefits be, and the same hereby is, GRANTED; (3) MetLife's motion for an injunction enjoining claimants from asserting claims related to the Plan benefits be, and the same hereby is, GRANTED; (4) MetLife's motion for attorneys' fees and costs be, and the same hereby is, GRANTED in the amount of $ 2,700.00, payable from the fund deposited with the court.

DATED: November 26, 2007

/s/ William B. Shubb

WILLIAM [*11] B. SHUBB

UNITED STATES DISTRICT JUDGE

Exhibit C-2  Page 266

# EXHIBIT "C-3"

Exhibit C-3 Page 207

LEXSEE 83 FED APPX 425

**METROPOLITAN LIFE INSURANCE COMPANY v. MARY T. KUBICHEK; PATRICIA A. BRENNAN-KUBICHEK, Patricia A. Brennan-Kubichek, Appellant**

**No. 02-4254**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**83 Fed. Appx. 425; 2003 U.S. App. LEXIS 24867; 31 Employee Benefits Cas. (BNA) 2608**

**November 21, 2003, Submitted Under Third Circuit LAR 34.1(a)**
**December 10, 2003, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY. D.C. Civil No. 01-cv-03174. District Judge: The Honorable Anne E. Thompson.

**DISPOSITION:** Affirmed. Appellee's motion for attorney's fees granted.

**COUNSEL:** For Metro Life Ins Co, Appellee: Randi F. Knepper, Del Mauro, DiGiamio, Knepper & Heck, Morristown, NJ.

For Patricia A. Brennan-Kubichek, Appellant: Edward L. Paul, Sklar & Paul, Voorhees, NJ.

For Mary T. Kubichek, Appellee: Robert B. Gigl, Jr., Janet S. Bayer, Stein, Bliablias, McGuire, Livingston, NJ.

**JUDGES:** Before: RENDELL, BARRY, and MAGILL, * Circuit Judges

      * The Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

**OPINION BY:** Maryanne Trump Barry

**OPINION**

    [*427] BARRY, *Circuit Judge*

**I. BACKGROUND**

The parties are familiar with the facts of this case, and, thus, we will provide but a brief summary of those facts at the outset, incorporating additional facts only as necessary to our discussion of the issues.

Metropolitan Life Insurance Company ("MetLife") [**2] carried the life insurance policies for William F. Kubichek ("decedent") as part of its group life insurance plan ("the plan") for the decedent's employer, General Motors Corporation ("GM"). On January 31, 1977, the decedent enrolled in the basic group life insurance policy ("basic policy"), and named his mother, Mary T. Kubichek ("Kubichek"), as the beneficiary. On May 5, 1977, the decedent enrolled in the optional group life insurance policy ("optional policy") for an additional $ 15,000 of insurance, and named Kubichek as the beneficiary.

The plan states that it will pay life insurance benefits to the beneficiary of the basic policy named on the proper form, and that the insured may change the beneficiary "at any time by filing written notice thereof on such a form with [GM] or [MetLife]." The same terms apply for designating and changing the beneficiary on the optional policy.

On October 9, 1983, the decedent married appellant Patricia A. Brennan-Kubichek ("Brennan"). On April 15, 1984, he used the proper form to designate Brennan as the sole beneficiary of his basic life insurance policy. The optional policy is not among those listed that he could have checked off or circled.

[**3] In 1990, the decedent was laid off by GM. When reinstated, he was purportedly required to resubmit documentation to reinstate his group life insurance benefits. On February 21, 1991, the Regional Personnel Administration Center sent him a letter requesting him to submit a copy of his birth certificate to secure his participation in the Salaried Retirement Program. Brennan

Exhibit C-3 Page 208

submitted into evidence a letter dated February 24, 1991 - found, she said, by her among the household files, signed by the decedent, and sent to the Regional Personnel Administration Center - that enclosed the decedent's birth certificate, and stated:

> In addition I have asked on more then [sic] one occasion for a copy of my conformation [sic] of my benificiary [sic] designation to be sure my wife Patricia Kubichek is my sole benificiary [sic] on all policies, basic and optional life and all stock and pension information. I can not understand the problem with my request. Please forward this to the correct department and person so I may have a copy for my records.

According to MetLife, GM was unable to locate its copy of this letter. On November 19, 1991, the GM National Benefit Center sent [**4] a letter acknowledging receipt of the decedent's life insurance enrollment form, and indicating that he had again signed up for a $ 50,000.00 basic policy and an additional $ 15,000.00 optional policy. The letter does not indicate who the beneficiaries of these policies are.

The decedent passed away on September 24, 2000. On November 9, 2000, the full $ 116,300.00 in proceeds from the basic life insurance policy was paid to Brennan. [*428] Brennan and Kubichek submitted competing claims to MetLife for the $ 58,200.00 in proceeds from the optional policy. [1] Brennan alleges that the decedent changed the beneficiary designation for the optional policy from Kubichek to her in 1991, as evidenced by the correspondence she produced in this litigation. [2]

> 1  The record does not indicate how, why, or when (after November 19, 1991) the decedent's insurance coverage rose to these amounts.
> 2  Brennan also testified at her deposition that the decedent told her that she was the beneficiary of his life insurance policies, though she had no specific knowledge of him filling out a change of beneficiary form.

[**5]  Unable to resolve this dispute, on July 5, 2001 MetLife filed an interpleader action, pursuant to FED. R. CIV. P. 22, in the District Court for the District of New Jersey, naming Brennan and Kubichek as defendants. MetLife deposited the $ 58,200.00 with the Court for distribution to whichever party the Court saw fit. MetLife also sought an injunction, pursuant to 28 U.S.C. § 2361, restraining Brennan and Kubichek from instituting any action related to the policies against it, GM, or

the plan. Brennan served on counsel her Answer, but never filed that Answer with the District Court.

On March 2, 2002, Kubichek moved for summary judgment on the ground that no documentation was produced showing that the decedent ever changed the beneficiary of his optional policy from her to Brennan. On March 7, 2003, MetLife moved for summary judgment, asking for an order (1) releasing and discharging MetLife and GM from all liability to anyone arising out of a claim for the benefits from the decedent's life insurance policies; (2) restraining Kubichek and Brennan from instituting any lawsuits against either MetLife or GM seeking benefits [**6]  or asserting damages or other claims arising under or pursuant to the decedent's life insurance policies; and (3) awarding attorneys' fees and costs, payable from the policy proceeds. On May 22, 2003, the District Court granted both motions, awarding the proceeds to Kubichek, discharging MetLife, enjoining Kubichek and Brennan from suing MetLife or GM, and awarding MetLife attorneys' fees and costs to be paid from the proceeds of the optional policy.

Brennan appeals, arguing that genuine questions of material fact exist precluding summary judgment in Kubichek's favor, that she is entitled to summary judgment in her favor because the decedent substantially complied with MetLife's policy when designating her as the beneficiary of the optional policy, and that the Court should not have enjoined her from suing either MetLife or GM since both breached their fiduciary duties by allegedly losing the decedent's 1990 enrollment form. MetLife responded to Brennan's appellate brief; Kubichek did not.

The insurance plan is regulated by ERISA, 29 U.S.C. §§ 1001-1461, and therefore the District Court's subject matter jurisdiction was based on 29 U.S.C. § 1132 [**7]  (e)(2), as well as 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Summary Judgment for Kubichek

A court may enter summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The court must view all evidence, and draw all inferences therefrom, in the light most favorable to the [*429] non-moving party, here Brennan. See, e. g., Williams v. Morton, 343 F.3d 212, 216 (3d Cir. 2003). Our review of the District Court's grant of summary judgment is plenary. See, e. g., Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003).

Exhibit C-3 Page 209

83 Fed. Appx. 425, *; 2003 U.S. App. LEXIS 24867, **;
31 Employee Benefits Cas. (BNA) 2608

In New Jersey, an insured may not change the beneficiary of a life insurance policy except by "substantial compliance" with the method provided in the contract between the insured and the insurer. *Strohsahl v. Equitable Life Assurance Soc'y of the United States*, 71 N.J. Super. 300, 304, 176 A.2d 814 (Ch. Div. 1962). [**8] "An insured will be released from a strict observance of the terms of the policy if the court can be convinced that the insured made every reasonable effort to effect a change of beneficiary." *Haynes v. Metro. Life Ins. Co.*, 166 N.J. Super. 308, 313, 399 A.2d 1010 (App. Div. 1979).

The MetLife plan will pay life insurance benefits to the beneficiary of the basic policy named on the proper form, and the insured may change the beneficiary "at any time by filing written notice thereof on such a form with [GM] or [MetLife]." The same terms apply for designating and changing the beneficiary for the optional policy. Brennan's strongest evidence demonstrating that the decedent substantially complied with this policy is the letter of February 24, 1991, purportedly sent from the decedent to MetLife, asking MetLife to confirm the change of beneficiary to Brennan. [3] This letter, if authentic, is a written expression of the decedent's desire to make Brennan the designated beneficiary for both policies. It also reports that the decedent made repeated efforts to effectuate this change.

> 3    Brennan also argues that the decedent, by way of the 1984 form, designated her at that time as the beneficiary for both policies. She argues that, because the 1984 form does not have a box to check for the optional policy, the decedent intended to change the beneficiary for *all* of his policies at that time. We are not persuaded by this reasoning.

[**9] Nevertheless, there is no evidence, however the decedent may have articulated his intentions in a letter, that he in fact substantially complied with MetLife's change of beneficiary policy. The letter itself is of questionable authenticity. Even if it were authentic, however, it would fall short of showing that the decedent did complete and submit the proper forms, or even that he tried to, and substantially did, do so. The November 19, 1991 letter from GM to the decedent, confirming his enrollment in the basic and optional policies, does not reveal in any way that the he *changed* his beneficiary designation; it merely shows that he *renewed* his enrollment following his furlough.

The cases cited by the District Court support this conclusion. For example, in *Czoch v. Freeman*, 317 N.J. Super. 273, 721 A.2d 1019 (App. Div. 1999), the Court rejected as insufficient evidence of substantial compliance a vague oral expression of an intent to change beneficiaries. *Id.* at 284-89. While acknowledging that literal compliance with the insurer's change of beneficiary policy was unnecessary, the Court cited examples in which there were written agreements [**10] or judgments evidencing substantial compliance with the insurer's change of beneficiary policy. *Id.* The letter here does not approach the certainty of the examples cited in *Czoch* -e.g. property settlement agreement between separated spouses, *id.* at 285-87 (citing *Vasconi v. Guardian Life Ins. Co.*, 124 N.J. 338, 590 A.2d 1161 (1991), and *Seavey v. Long*, 303 N.J. Super. 153, 696 A.2d 102 (App. Div. 1997)), and a divorce judgment naming a beneficiary, *Czoch*, 317 N.J. Super. at 286-87 (citing *Prudential Ins. Co. v. Prashker*, 201 N.J. Super. 553, 493 A.2d 616 [*430] (App. Div. 1985)). And although the decedent in *Haynes* substantially complied with his insurer's change of beneficiary policy, that case is distinguishable. In *Haynes*, the decedent *filed the appropriate forms with the insurer*, but did not submit the policies with these forms - and thereby comply fully - because the policies were in the possession of his estranged wife. *Haynes*, 166 N.J. Super. at 311.

In sum, Brennan has not demonstrated that the decedent substantially complied with MetLife's change of beneficiary [**11] policy to name her the beneficiary of his optional policy. We will affirm the District Court's granting of Kubichek's motion for summary judgment.

### B. *MetLife/GM Injunction*

Although an injunction issued in an interpleader action must not be overbroad, *United States Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 211 (3d Cir. 1999), our review of the District Court's decision to grant injunctive relief pursuant to 28 U.S.C. § 2361 is for an abuse of discretion. *See, e. g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Karp*, 108 F.3d 17, 23 (2d Cir. 1997).

Brennan, in her appellate brief, asserts her right to sue MetLife and/or GM for breach of fiduciary duty for losing or misplacing the documents relevant to this case - namely, the 1991 enrollment form on which she claims the decedent named her as the beneficiary of his optional policy. She contests the injunction with respect to GM in particular because it was not even a party to the interpleader action. MetLife, in rebuttal, argues that Brennan's alleged breach of fiduciary duty claims are compulsory counterclaims that she waived when she failed to assert them in [**12] the interpleader action.

FED. R. CIV. P. 13(a) states that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim

Exhibit C-3 Page 240

83 Fed. Appx. 425, *; 2003 U.S. App. LEXIS 24867, **;
31 Employee Benefits Cas. (BNA) 2608

...." We recently summarized our standard in applying this Rule:

> For a claim to qualify as a compulsory counterclaim, there need not be precise identity of issues and facts between the claim and the counterclaim; rather, the relevant inquiry is whether the counterclaim "bears a logical relationship to an opposing party's claim." *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978). The concept of a "logical relationship" has been viewed liberally to promote judicial economy. Thus, a logical relationship between claims exists where separate trials on each of the claims would "involve a substantial duplication of effort and time by the parties and the courts." *Id.* Such a duplication is likely to occur when claims involve the same factual issues, the same factual and legal issues, or are offshoots of the same [**13] basic controversy between the parties.

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389-90 (3d Cir. 2002).

Applying this standard, we agree with MetLife that Brennan's potential breach of fiduciary duty claims against MetLife and GM were compulsory counterclaims that should have been asserted in the interpleader action. Brennan's contention that MetLife and/or GM misplaced, mishandled, or lost the decedent's 1991 enrollment form clearly bears a logical relationship to the claims in that action - the existence of that form was the crucial issue in determining whether the decedent designated Brennan as the beneficiary of his optional [*431] policy. The District Court's examination of the relevant letters and testimony in that action, so to determine the proper beneficiary, would be largely duplicated in any breach of fiduciary duty action. Since Brennan's Answer in the interpleader action did not assert these counterclaims, those claims are barred by res judicata, and the District Court's injunction was not an abuse of discretion. The Fifth Circuit, we note, faced a similar issue in *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873 (5th Cir. 1998), [**14] and came to the same conclusion.

We will affirm the injunction with respect to GM as well, despite it not being a party, because of the close relationship between MetLife and GM in this action. In *Transamerica, supra*, we held that the rationales supporting a liberal reading of "transaction or occurrence" in Fed. R. Civ. P. 13(a) should also apply to "opposing party," such that the potential counter-claimant is obligated to assert his or her counterclaim against even an unnamed party if it arises out of the same transaction or occurrence and if the unnamed party is the functional equivalent of the named party, is controlling the litigation, or is an alter ego of the named party. *Transamerica*, 292 F.3d at 391. We reasoned that this application should mirror the understanding of the parallel actors in the res judicata context, such that "claims against parties in privity should be brought in the same action lest the door be kept open for subsequent relitigation of the same claims." *Id.* at 392. We also emphasized the importance of the potential counter-claimant knowing of the close relationship [**15] between the named and unnamed parties, as is the case here. *Id.* Applying *Transamerica* to this case, Brennan was obligated to bring her counterclaims against both MetLife and GM. Because she did not, her breach of fiduciary duty claims against both are barred by res judicata, and the grant of the injunction will be affirmed.

C. *MetLife's Costs and Fees*

Having received attorneys fees and costs with respect to the proceedings in the District Court, MetLife now seeks attorneys fees and costs relating to Brennan's appeal, claiming that it is still an interpleader plaintiff with no interest in the disposition of the proceeds already deposited with the District Court.

A court has the discretion to award to an interpleader plaintiff attorneys fees and costs if the plaintiff is (1) a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds with the court, and (4) has sought a discharge from liability. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir 1989) (citing 3A MOORE'S FEDERAL PRACTICE P2.16[2] (2d ed. 1989)).

MetLife meets these criteria on appeal, just as it did for the proceedings in [**16] the District Court. Although MetLife surely has an interest in having us affirm the grant of the injunction, its participation in this appeal is merely a continuation of its role as a disinterested interpleader plaintiff that has discharged its obligations. Because we find no merit in Brennan's argument that the injunction was an abuse of discretion, MetLife is entitled to its costs and attorneys fees for this appeal.

/s/ Maryanne Trump Barry

Circuit Judge

Exhibit C-3 Page 211

# EXHIBIT "C-4"

Exhibit C-4 Page 212

LEXSEE 2006 US DIST LEXIS 47907

**THE UNDERWRITERS GROUP, INC., Interpleader Plaintiff, v. CLEAR CREEK INDEPENDENT SCHOOL DISTRICT, ET.AL.**

**CIVIL ACTION NO. G-05-334**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, GALVESTON DIVISION**

**2006 U.S. Dist. LEXIS 47907**

**June 30, 2006, Decided
June 30, 2006, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Dismissed by Underwriters Group v. Clear Creek Indep. Sch. Dist., 2006 U.S. Dist. LEXIS 78788 (S.D. Tex., Oct. 27, 2006)

**COUNSEL:** [*1] For The Underwriters Group, Inc., Interpleader: Ronald Joseph Restrepo, Doyle Restrepo et al, Houston, TX.

For Clear Creek Independent School District, Claimant: Clay T Grover, Feldman & Rogers, Houston, TX.

For Braselton Construction Company, Claimant: William W Pierson, Royston Rayzor et al, Corpus Christi, TX; William P Glenn, Jr, Royston Rayzor et al, Galveston, TX.

For Braselton Construction Company, Counter Claimant: William W Pierson, Royston Rayzor et al, Corpus Christi, TX; William P Glenn, Jr, Royston Rayzor et al, Galveston, TX.

For The Underwriters Group, Inc., Counter Defendant: Ronald Joseph Restrepo, Doyle Restrepo et al, Houston, TX.

For Clear Creek Independent School District, Cross Claimant: Clay T Grover, Feldman & Rogers, Houston, TX.

For Braselton Construction Company, Cross Defendant: William W Pierson, Royston Rayzor et al, Corpus Christi, TX; William P Glenn, Jr, Royston Rayzor et al, Galveston, TX.

For Braselton Construction Company, Cross Claimant: William P Glenn, Jr, Royston Rayzor et al, Galveston, TX.

For Clear Creek Independent School District, Cross Defendant: Clay T Grover, Feldman & Rogers, Houston, TX.

For [*2] Braselton Construction Company, Cross Defendant: William P Glenn, Jr, Royston Rayzor et al, Galveston, TX.

**JUDGES:** John R. Froeschner, United States Magistrate Judge.

**OPINION BY:** John R. Froeschner

**OPINION**

**OPINION AND ORDER**

Plaintiff, The Underwriters Group ("Underwriters"), filed an "Original Complaint in Interpleader and Declaratory Judgment" ("Interpleader") on June 9, 2005. Now before the Court is Underwriters' Motion for Summary Judgment ("Underwriters Motion") filed on February 27, 2006. Defendant Clear Creek Independent School District ("CCISD") filed a Response to Underwriter's Motion, and Underwriters filed a Reply. Defendant Braselton Construction Company ("Braselton") filed no response to Underwriters' Motion.

Also before the Court are Defendant Braselton's "Motion for Summary Judgment and Motion to Dismiss [Defendant CCISD's] Cross-Claims" ("Braselton Motion"), to which both Underwriters and CCISD filed a Response; and Defendant CCISD's "Cross-Motion for Partial Summary Judgment" ("CCISD Motion"), to

Exhibit 14  Page 213

Case 3:08-cv-00640-JAH-BLM    Document 18-8    Filed 07/21/2008    Page 21 of 29

Page 2
2006 U.S. Dist. LEXIS 47907, *

which both Braselton and Underwriters filed a Response. The Court has carefully considered the parties' submissions and now issues this Opinion and Order.

## JURISDICTION

[*3] Underwriters brought this Interpleader action on June 9, 2005, under Rule 22 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1332. The amount of the controversy exceeds $ 75,000.00. For purposes of diversity under 28 U.S.C. § 1332, Plaintiff avers that it is a Florida corporation with its principal place of business in Florida. (Interpleader P 1). Defendant Braselton is a Texas corporation with its principal place of business in Texas (Interpleader P 3; Braselton's Answer P 3); and Defendant CCISD is an independent school district created under the laws of Texas and located in Galveston County. (Interpleader P 2; CCISD's Answer P 2). Accordingly, the Court has jurisdiction over this matter.

## VENUE

Underwriters originally brought this Interpleader action in the Federal District Court located in Galveston, Texas pursuant to 28 U.S.C. § 1391. Defendant CCISD is located in Galveston County. No party contests venue and the Court finds venue to be proper.

## BACKGROUND

On October 7, 2004, Braselton submitted a bid proposal for the construction of [*4] several CCISD Elementary School Gymnasiums Additions in the amount of $ 5,425,436.00 ("the Project"). (Braselton Mot., Ex. A). In its bid proposal, Braselton identified "Financial Casualty & Surety" as its "proposed surety." (Braselton Mot., Ex. A at P 8). Braselton also agreed in its bid proposal to "sign and return [to CCISD] the Agreement with the Bonds, Insurance, and other documents required by the [CCISD] Bidding Requirements within 5 days after they are presented to the Offeror [Braselton] for signature." (Braselton Mot. Ex. A at P 9.5).

Braselton's bid for the Project was selected by CCISD. On October 26, 2004, CCISD and Braselton executed a written contract that consisted of a "Standard Form of Agreement between Owner and Contractor" ("Contract") and a "Supplementary Conditions to the Contract for Construction" ("Supplementary Conditions"). (Braselton Mot., Ex. B & C). [1] The Contract and Supplementary Conditions required the execution and submission of performance and payment bonds, issued by a qualified surety company, [2] before work could commence on the Project. (Braselton Mot., Ex. B at 700-34; Ex. C at 800-15, 800-17).

---

1    The Court refers to the bates numbers contained in the Exhibits when provided.

[*5]
2

The Supplementary Conditions provided the following:

### ARTICLE 11 -- INSURANCE AND BONDS

11.5.3 The Performance Bond Form and The Payment Bond Form included herein shall be executed and submitted to the Architect in duplicate prior to the commencement of the work. *The surety companies must be acceptable to the Owner and licensed admitted carriers in the State of Texas; and the companies must appear in a current Federal Treasury list as Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and as Acceptable Reinsuring Companies.*

*11.5.4 Each bond shall be of penal sum equal to 100% of the Contact Sum and shall be compatible with the provisions of the governing authority.* The Contractor shall file copies of each bond with the county clerk and furnish the Owner with a file receipt. The bonds shall remain in force throughout the warranty period of the contract. The Work will not be started until the bonds and issuing companies have been accepted as satisfactory by the Owner. The original bonds will be delivered to the Owner with an authorized power of attorney attached. [Emphasis added]. (Braselton Mot., Ex. C at 800-17 -- 800-18).

[*6]    On October 25, 2004, a day before the parties executed the Contract and Supplementary Conditions for the Project, the documentation provided reflects First Mountain Bancorp issued a "Trust Receipt." (Braselton Mot., Ex. G). The Trust Receipt set forth "Clear Creek Independent School District" as the named beneficiary and further provided, as a reference, "Elementary School Gymnasiums Package # 1 / Braselton Construction

Exhibit C 4 Page 214

Company, Inc." (Braselton Mot., Ex. G). According to CCISD, it was not then aware of the existence or issuance of this Trust Receipt. (CCISD Mot. at 2-3).

On October 29, 2004, a Performance Bond was purportedly issued, witnessed, and executed between the Surety, "Financial Casualty & Surety," by Senior Underwriter Robert S. Harrison, and the Principal, Braselton Construction Company, by President Walter Drane, in Corpus Christi, Texas. (Braselton Mot., Ex. D at 810-1; 810-2). A Payment Bond was also issued and signified the Principal as Braselton Construction Company and the Surety as Financial Casualty and Surety. (Braselton Mot., Ex. E at 820-1). [3]

> 3    Although Defendant Braselton informs the Court that the Payment Bond was also issued on October 29, 2004, the signature page for the Payment Bond was not included in the Exhibits.

[*7] Braselton commenced work on the Project and, shortly thereafter, on November 19, 2004, submitted an "Application and Certificate for Payment" ("Application") to CCISD through the Project architect. (CCISD Mot., Ex. 1). The Application consisted of several items of scheduled charges equaling $ 289,755.22. Included in this amount were charges for "Bonds and Insurance" in a combined stated total of "$ 257,700.00." (CCISD Mot., Ex. 1). [4] The Project architect certified the Application on November 22, 2004, and the documentation reflects that CCISD issued a check to Braselton for the total amount of $ 289,755.22 on December 3, 2004. (CCISD Mot., Ex. 1 and Ex. 2). From the first payment draft it received from CCISD, Braselton paid "The Underwriters Group" a premium in the amount of $ 208,788.20, for the Trust Receipt previously issued on October 25, 2004. [5] (Braselton Mot. at 2; Ex. F).

> 4    Based on the documentation submitted, and for purposes of clarity, it appears that 100% of the stated total for the "Bonds and Insurance" was paid by CCISD. The remainder of the amount CCISD paid to Braselton was paid based on a percentage of other stated charges. (CCISD Mot., Ex. 1 (Continuation Sheet)).

[*8]

> 5    The Court notes that no evidence has been presented showing how or when payment was issued by Braselton for the Performance and Payment bonds that were purportedly executed and issued on October 29, 2004.

Braselton continued work on the Project and, on March 1, 2005, submitted its fourth Application in the amount of $ 397,814.04. (Braselton Mot. at 2; Ex. H). Shortly thereafter, Braselton somehow discovered that the payment and performance bonds were not valid.

(Braselton Mot. at 2). CCISD contends that in or around March 2005, it learned "from an unpaid subcontractor of Braselton, who had been attempting to make a claim on the payment bond, that the bonds were likely fraudulent." (CCISD Mot. at 3; CCISD Original Answer, P 16). CCISD contended that the continuation of the Project, in absence of the surety bonds, would have been a violation of Texas law as proscribed by Texas Government Code § 2253.021. Therefore, on or about March 9, 2005, CCISD gave written notice to the President of Braselton Construction that it was to suspend work on the Project immediately [*9] (Braselton Mot., Ex. I); and also provided Braselton with seven (7) days to remedy the problem by securing valid payment and performance bonds. (Braselton Mot. at 3). In addition, due to the "subsequent developments regarding the validity of the Performance and Payment Bonds," on March 10, 2005, the Project architect nullified his certification of Braselton's "Application for Payment No. 4" (Braselton Mot., Ex. J). On March 23, 2005, CCISD informed Braselton that it was terminating the Contract for the Project because Braselton had not yet provided valid bonds. (Braselton Mot., Ex. K; CCISD Mot. at 4).

Following the termination of the Contract, a series of letters were exchanged between the parties in which competing demands were made for the return of the funds used to pay Underwriters for the Trust Receipt. The first was a letter dated March 28, 2005, written by Braselton's attorney in which he demanded return of the $ 208.788.20 that Braselton paid to Underwriters "to obtain bonding for a construction project." (Braselton Mot., Ex. M). Underwriters, through its attorney, responded in a letter dated March 31, 2005, that set forth its understanding of the events that had transpired [*10] and also provided, in part, "[b] ecause the CCISD rejected Mr. Harrison's individual surety bond backed by the trust receipt, *our client must receive the original trust receipt before refunding the funds* paid by Braselton in connection therewith." [Emphasis added]. (Braselton Mot., Ex. N). [6] In a letter dated April 4, 2005, Braselton's counsel responded to Underwriters by representing that CCISD "rejected the proposed bond," confirming that Braselton was not in possession of the original trust receipt, and once again demanding the return of the funds. (Braselton Mot., Ex. O). On April 5, 2005, Underwriters sent a letter to CCISD setting forth its understanding of the facts, and requesting written verification that CCISD did not have the original trust receipt and that CCISD did not have a "claim against these funds or this trust receipt so that our client may disburse the funds to Braselton." (Braselton Mot., Ex. O). CCISD responded in a letter dated April 6, 2005, through their attorney, by also making a demand for the funds. (Braselton Mot., Ex. Q; Interpleader at P 8).

Exhibit C-4 Page 215

6    The Court observes that only the first page of this letter was provided.

[*11]    Confronted with these conflicting claims, on June 9, 2005, Underwriters brought this Interpleader action and also filed a Motion to Deposit Funds, in an amount totaling $ 208,788.20, into the registry of the Court. On June 13, 2005, the Court by Order accepted the payment of the funds into the Court Registry.

## I.

## INTERPLEADER

An interpleader action is an equitable remedy that has long existed for the purpose of enabling "a neutral stakeholder, usually an insurance company or a bank, to shield itself from liability for paying over the stake to the wrong party. This is done by forcing all the claimants to litigate their claims in a single action brought by the stakeholder." 7 Charles Alan Wright, Arthur Miller & May Kay Kane, *Federal Practice and Procedure* § 1702 (3d ed. 2001).

A court analyzes an interpleader action in "two distinct steps." The first step requires "the court to decide whether the jurisdictional requirements for an interpleader action have been met." *General Electric Capital Assurance v. Van Norman*, 209 F. Supp.2d 668, 670 (S.D. Tex. 2002). Generally, "[i] f there is a single fund at issue and adverse claimants to that fund, [*12] this requirement is usually satisfied." *General Electric*, 209 F.Supp.2d at 670 (citing to *Rhoades v. Casey*, 196 F.3d 592, 600 (5th Cir. 1999). However, the party seeking the interpleader bears the burden of establishing that the requirements are satisfied. [7] 7 Wright, Miller & Kane, *supra* § 1714. If the party seeking interpleader, commonly referred to as the stakeholder, satisfies the interpleader requirements, he may seek dismissal from the action. *Id.*

7    An interpleader action may be brought under Rule 22 of the Federal Rules of Civil Procedure or under 28 U.S.C. § 1335, and the requirements of each are slightly different.

After concluding that the requirements of an interpleader action are satisfied, a court moves on to the second step of the analysis which requires the court to determine the "'claimants' respective rights to the fund." *General Electric*, 209 F. Supp.2d at 670 (citing [*13] to 7 Wright, Miller & Kane, *supra* § 1714). At this stage, the interests of the respective claimants are adverse and may be adjudicated by summary judgment if there are no genuine issues of material fact regarding which claimant is rightfully entitled to the interplead funds. 7 Wright, Miller & Kane, *supra* § 1714. However, when genuine issues of material fact exist, each claimant bears the bur-

den of proving his right to the fund by a preponderance of the evidence at trial by the ultimate finder of fact. *General Electric*, 209 F.Supp.2d at 670; 7 Wright, Miller & Kane, *supra* § 1714.

### A. Rule 22 Interpleader

### 1. Satisfaction of Requirements

Underwriters brought this Complaint for interpleader under Rule 22 and 28 U.S.C. § 1332, seeking a declaratory judgment that it has no further liability or obligation to either Braselton or CCISD, requesting dismissal from the action, and further seeking attorney fees for filing the interpleader action. (Interpleader at 3-4). Thereafter, Underwriters also filed a Motion for Summary Judgment in which it seeks declaratory judgment and again seeks dismissal from the action without [*14] further costs or liability. (Underwriters Mot. at 2-3). Defendant Braselton filed no response to Underwriters' Motion. Defendant CCISD filed a Response to Plaintiff's Motion in which they contest any award of attorney fees to Underwriters.

Rule 22 provides that "[p] ersons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. . . ." Fed. R. Civ. Proc. 22. Unlike a statutory interpleader action, an action commenced under Rule 22 does not require the stakeholder interplead the funds into the registry of the court. *Compare* 28 U.S.C. § 1335(a) *with* Fed. R. Civ. Proc. 22.

As evidenced by the letters submitted, once it was discovered that the Performance and Payments bonds issued for the Project were invalid, Underwriters was faced with competing claims from both Braselton and CCISD for the return of the funds used to purchase the Trust Receipt. (Braselton Mot., Ex. M (March 28, 2005 Letter from Braselton); Ex. N (March 31, 2005 Letter from [*15] Underwriters); Ex. O (April 4, 2005 letter from Braselton); Ex. P (April 5, 2005 Letter from Underwriters); & Ex. Q (April 6, 2005 Letter from CCISD)). Essentially, Braselton demanded Underwriters return the funds to it because it issued the check to Underwriters to purchase the Trust Receipt. CCISD made a similar demand to Underwriters alleging that they were entitled to the funds because its money was used to procure the Trust Receipt. Rather than run the risk of paying the proceeds to the wrong person, and thereby potentially incurring multiple liability, Underwriters filed this action because the claimants had not formally settled their dispute over their respective claims to the fund. Underwriters does not claim any right of offset, credit or other entitlement to the proceeds. Moreover, there is no basis to conclude that Underwriters has participated in the liti-

Exhibit C-4 Page 216

gation as an adversary or ally to either claimant. *See Rhoades v. Casey*, 196 F.3d at 603.

Finally, although not required under Rule 22, Underwriters immediately moved to deposit the entire amount of the funds into the Court Registry and, on June 13, 2005, the Court ordered the deposit of the funds into [*16] the Court Registry. Payment of the entire amount of the fund into the Court Registry constitutes an unconditional tender. [8] *See Murphy v. Travelers Ins.* Co., 534 F.2d 1155, 1165 (5th Cir. 1976).

> 8    Underwriters requests the Court consider attorney fees and costs in this case, but did not condition the tender of the funds on this request. Accordingly, Underwriters request is not tantamount to a conditional tender of the funds.

The Court concludes that the Rule 22 interpleader requirements have been satisfied and, having made this determination, turns next to consider whether Underwriters may be dismissed from the action. *See General Electric*, 209 F. Supp.2d at 670.

## 2. Dismissal of Underwriters as Stakeholder

CCISD contends that Underwriters must still be considered an interested party to the action and is not entitled to be dismissed, because of Braselton's counterclaim against Underwriters. The Court observes that Braselton did file a "counterclaim" against Underwrites [*17] in which it seeks attorney fees and prejudgment interest because it contends that Underwriters acted in bad faith in failing to return the interpled funds to Braselton when it was clear that CCISD has no legal or equitable interest in the funds or, in the alternative, that Underwriters was dilatory in failing to interplead the funds. (Braselton's Answer, Counterclaim, and Joinder at 2-3). In addition, Braselton asserts that Underwriters is not entitled to attorney fees because it unreasonably delayed in filing the action; bringing an interpleader action is part of Underwriters' ordinary cost of doing business and, as such, these fees and costs should not be shifted to the owner of the funds; and Underwriters is not an innocent stakeholder because it has not unconditionally interpled the funds into the court.

Initially, the Court observes that Braselton filed no response to Underwriters Motion in which it seeks to be dismissed from claims or liability. Nevertheless, the Court will proceed to address this matter.

"Although a factual dispute may exist as to the rightful ownership of the fund, that dispute does not preclude the granting of summary judgment in favor of the interpleader. [*18] It is the very nature of an interpleader action that two or more parties claim rights to certain money or property." *Commerce Funding Corp. v.*

*Southern Financial Bank*, 80 F.Supp.2d 582, 585 (E.D. Va. 1999). Nevertheless, a court may delay or deny discharge of the stakeholder if there are "serious charges that the stakeholder commenced the action in bad faith." *Mendez v. Teachers Ins. & Annuity Assoc.*, 982 F.2d 783, 788 (2nd Cir. 1992). However, no such evidence exists here of bad faith by Underwriters. It is widely recognized that a stakeholder is "entitled to bring an interpleader action where competing claims for the stake are not patently invalid, even if one claimant asserts that its right to the stake is so certain as to make any competing claim frivolous." 21 Fed. Proc., L. Ed. § 49:5 (West 2006). Given the facts and circumstances in the present case, Underwriters not only had reasonable fear of vexatious and conflicting claims, but was, in fact, actually presented with competing demands for the funds. Moreover, even though Braselton asserts that Underwriters was dilatory in filing the action, the facts clearly do not support any such claim.   [*19]    At most, two months elapsed from the time Underwriters was notified of the competing claims and the time it filed this interpleader action. Given these facts, it is difficult to conceive how any reasonable trier of fact could conclude that Underwriters unduly delayed in filing the interpleader action or commenced the action in bad faith. *Contra Mendez*, 982 F.2d at 787-88 (2nd Cir. 1992) (stakeholder not only commenced interpleader action in bad faith where it not only knew, but also conceded for months that competing claim was baseless, and also unreasonably delayed in tendering the allegedly disputed funds for nearly a year and a half). Where the facts do not clearly demonstrate that the stakeholder acted in bad faith or was dilatory in filing an interpleader, it is improper for a court to even consider imposing costs or fees against the stakeholder. *See Murphy*, 534 F.2d at 1164 (holding that fees and costs should not be assessed against life insurance company because it did not delay, nor did it act in bad faith by failing to pay the undisputed portion of the policy proceeds); *Gelfgren v Republic Nat'l Life Ins. Co.*, 680 F.2d 79, 81 (9th Cir. 1982) [*20]  (trial court did not err in refusing to award costs against insurance company that interpleader of life insurance proceeds where competing claims existed).

Notwithstanding these points, it is perhaps more important to consider the nature of the "counterclaims" presented. Specifically, as alleged, Braselton's counterclaims fail to raise any claims of independent liability by Underwriters. Instead, the basis for Defendant Braselton's counterclaims appear to rest on the contention that an interpleader was unnecessary because it was evident that Braselton was entitled to the funds and, even if it were not, that Underwriters delayed in bringing the action therefore depriving Braselton of the use of these funds. However, under interpleader rules, Underwriters is shielded from these "counterclaims." *See Metropolitan*

Exhibit C-4 Page 217

*Life Insurance Company v. Barretto*, 178 F.Supp.2d 745, 747-48 (S.D. Tex. 2001). Specifically, the court in *Metropolitan Life Insurance Company v. Barretto* explains:

> [a] n interpleader suit serves to shield an uninterested stakeholder from the costs of unnecessary, multiple litigation. [Citation omitted]. 'Were the defendants in the interpleader [*21] action permitted to carry forward with counterclaims against the stakeholder based upon the same interpleaded funds, the very purpose of the interpleader action would be utterly defeated.' [Citations omitted].

*Id.* Other courts have reached the same conclusions and summarily dismissed such counterclaims against the stakeholder. *See e.g., Daniels v. Equitable Life Assurance Soc. of the United States*, 35 F.3d 210, 214-15 (5th Cir. 1994) (where an interpleader is found proper, breach of contract and tort claims are collaterally estopped); *Equitable Life Assurance Society v. Jones*, 679 F.2d 356, 358 (4th Cir. 1982) (stakeholder is "not to be obliged to be at the expense and risk of defending an action; but on giving up the thing . . ., he is to be relieved, and the court directs that the persons between whom the dispute really exists shall fight it out at their own expense"); *Lutheran Brotherhood v. Comyne*, 216 F.Supp.2d 859, 862-63 (E.D. Wisc. 2002) (counterclaims based on plaintiff having opted to proceed on interpleader rather than choose amongst competing claims will be rejected because plaintiff is entitled to pursue interpleader [*22] relief); *Monumental Life Ins. Co. v. Lyons-Neder*, 140 F.Supp.2d 1265, 1272-74 (M.D. Ala. 2001) (summary judgment granted on counterclaims against plaintiff for bad faith and breach of contract because insurance company properly initiated interpleader action to determine rightful beneficiary of policy proceeds where deceased's wife was murder suspect); *United States Trust Co. v. Alpert*, 10 F. Supp. 2d 290, 307 (S.D.N.Y. 1998), *aff'd*, 168 F.3d 630 (2nd Cir. 1999) (proper commencement of interpleader did not give rise to counter-claim against stakeholder for failing to pay funds to counter-claiming defendant without benefit of interpleader action to adjudicate conflicting claims).

Consequently, the Court concludes that Braselton's allegations complain of Underwriters' actions, which are simply self-styled as "counterclaims," are "the result of its utilizing the protections afforded by the interpleader" and, therefore, can not constitute any independent cause of action against Underwriters. [9] *Barretto*, 178 F.Supp.2d at 748. Accordingly, the Court concludes that Underwriters is shielded from [*23] Braselton's "counterclaims" and, as such, these claims must be dismissed. *Id.* Because

Underwriters has no further obligation or liability to the parties under a theory for failing to pay them the disputed proceeds, the Court concludes that Underwriters is entitled to dismissal. *See Barretto*, 178 F.Supp.2d at 747-48; *Daniels*, 35 F.3d at 214-15.

> 9    In reviewing Braselton's counterclaim, the Court observes that Braselton relies upon *Bauer v. Uniroyal Tire Co.*, 630 F.2d 1287, 1290 (8th Cir. 1980) and *Gelfgren v. Republic Nat'l Life Ins. Co.*, 680 F.2d 79, 82 (9th Cir. 1982) to support its claim for pre-judgement interest. However, the Court finds that the facts in those cases distinguish them significantly from the present case. In both *Bauer* and *Gelfgren*, the stakeholder filed the interpleader, but did not pay the stake into the court registry, choosing to wait until the actions concluded several years later. In both cases, the courts awarded prejudgment interest after concluding that the stakeholders would otherwise be unjustly enriched for having unrestricted use of the funds for the several years it took to litigate the cases to conclusion. *Bauer*, 630 F.2d at 1290 (interest appropriate when stakeholder delayed more than a year in filing interpleader action and, never having paid the funds into the court registry, had full use of the funds during that time); *Gelfgren*, 680 F.2d at 82 (more than five years elapsed until the case concluded and during that time the stakeholder had full use of the fund and earned interest on it). Unlike those cases, in the present case Underwriters promptly requested to pay the entire amount of funds into the Registry of the Court, and the Court, shortly thereafter, ordered Underwriters to do so.

### [*24] C. Underwriters Request For Attorney Fees & Costs

In addition to seeking dismissal, Underwriters also requests attorney fees in the amount of $ 12,108.00 for having to file the interpleader action. (Underwriters Mot. at 3). In its Response to Underwriters' Motion, CCISD opposes the request. (CCISD Mot. at 4-6). Although Braselton filed no response to Underwriters' Motion, its opposition is also noted. (Braselton Answer & Counterclaim).

It is well-settled that "a district court has authority to award reasonable costs and attorney's fees to the disinterested stakeholder in rule interpleader actions." *See Rhoades v. Casey*, 196 F.3d at 603; *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 696 F.2d 359, 364 (5th Cir. 1983). An award of attorney fees and costs to a stakeholder, however, is not automatic. The decision rests

within the discretion of the court. *See Gulf Oil Corp. v. Olivier*, 412 F.2d 938, 946 (5th Cir. 1969); *Lincoln Income Life Ins. Co. v. Harrison*, 71 F.R.D. 27, 31-32 (W.D. Okl. 1976). Accordingly, a court may, for example, deny a stakeholder's request for costs and attorneys fees if there is culpability **[*25]** on the part of the stakeholder for failing to act in good faith and with diligence. *See Murphy*, 534 F.2d at 1164.

Generally, in determining whether attorneys' fees and costs should be awarded, a court will examine the following factors: "(1) Whether the case is simple or involved; (2) Whether the stakeholder performed any unique services for the claimants or the court; (3) Whether the stakeholder acted in good faith and with diligence; (4) Whether the services rendered benefitted the stakeholder; (5) Whether the claimants improperly protracted the proceedings." 7 Wright, Miller & Kane, *supra* § 1719.

In his affidavit, counsel for Underwriters states that a total of 85.8 hours was spent on this matter. According to counsel, 36.4 hours were billed for the "initial work" consisting primarily of "investigating the nature of the dispute, researching relevant law, analyzing jurisdiction and venue, and preparing the appropriate pleadings" at a reduced hourly rate of $ 135.00 instead of the normal billing rate of $ 160.00 per hour "to reduce further expense." (Underwriters Mot., Affidavit of Ronald J. Restrepo ("Affidavit") at PP 7-8). Underwriters also seeks expenses **[*26]** in this case in the amount of $ 640.00. (Underwriters Mot., Affidavit at P 9).

Although counsel's affidavit is helpful, in order to allow the Court to make such a determination in this case, Underwriters is hereby **ORDERED** to submit, within ten (10) days from the date of this Order, a more detailed accounting of the attorneys' fees and documentation for the costs it seeks to recover. In the event that Underwriters chooses not to provide a more detailed accounting, then Underwriters must signify this in a statement filed with the Court and served on the parties within the ten (10) day time period. Defendants will then have ten (10) days to respond to Underwriters' briefing. After that time, the Court will rule on whether Underwriters is entitled to an award of attorneys' fees and costs and, if so, in what amount. The Court will thereafter enter a Supplemental Order and Judgment.

**II.**

**DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

After concluding that the interpleader action was properly brought, the Court proceeds to the second step of the analysis that requires it to determine the "clai-

mants' respective rights to the fund." *General Electric Capital Assurance v. Van Norman*, 209 Fed. Supp.2d at 670. **[*27]** Both Braselton and CCISD have filed competing motions for summary judgment.

**A. Standard of Review**

Under Federal Rule of Civil Procedure 56(c), "if there is no genuine issue as to any material fact . . . the moving party is entitled to judgment as a matter of law." Federal Rule Civ. Proc. 56(c). The inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Once the moving party makes a properly supported motion for summary judgment, the burden shifts to the non-movant to show that summary judgment should not be granted, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A party opposing summary judgment must marshal sufficient facts to show that there is a genuine issue of material fact. *Id.* at 323-24. To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light **[*28]** most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Anderson*, 477 U.S. at 248; *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000).

**B. Braselton's Motion**

The central issue presented in this case is simple: to whom do the funds belong? In its Motion, Braselton contends it is entitled to summary judgment in its favor because the undisputed facts show that it "is the only party with present entitlement to the deposited funds" and that "CCISD does not have any entitlement to the funds" because the funds used to acquire the Trust Agreement "were, and are, Braselton's money." (Braselton Mot. at 4). Braselton also appears to aver that CCISD is not entitled to the funds because it was not in privity with regard to the purchase of the Trust Receipt and contends that it was not part of the Contract between Braselton and CCISD. (Braselton Mot. at 5).

In deciding Braselton's Motion, the Court is required to draw all reasonable inferences from the summary judgment evidence in favor of CCISD, the non-moving party. *Anderson*, 477 U.S. at 248. A careful **[*29]** review of the evidence submitted reveals that the Trust Receipt [10] was issued on October 25, 2005, a day before the parties executed the Contract for the Project and several days before the Performance and Payment Bonds were purportedly issued and executed. The Trust Receipt was apparently purchased to back the performance and

payment bonds required for the Project. The Court observes that in the single-paged document entitled "Trust Receipt," [11] CCISD is expressly named as the Beneficiary, along with a reference of the "Elementary School Gymnasiums Package # 1 / Braselton Construction Company, Inc." (Braselton Mot., Ex. G). The "Trust Receipt" also provides, in part, the following:

> FIRST MOUNTAIN BANCORP, formed under the laws of the State of Nevada, with the authorized signatures below, hereby *irrevocably acknowledge with the full Trustee responsibility* with a value of FIVE MILLION NINE HUNDRED SIXTY FIVE THOUSAND THREE HUNDRED SEVENTY SEVEN US DOLLARS ($ 5,965,377.00 US Dollars), *which is being held by an FDIC Insured Bank* in the form of a SKR on behalf of First Mountain Bancorp for one year *for the above named beneficiary* located [*30] at 2425 East main Street, League City, TX 77573-2799.

> Payment under this TRUST RECEIPT will be made to the beneficiary upon receipt of an invoice stating that such amount represents funds owed by obligee and are to be used to repay amounts outstanding certified to the offset and recovery by Robert Harrison, the Individual Surety and conditioned by the Payment & Performance Bond criteria until exonerated by the Obligee.

> * * *

> *All rights arising from the ownership of this TRUST RECEIPT* and this cash or cash equivalent represented thereby *shall be freely assignable and transferrable* without payment to us of any transfer fee *upon the written instructions from the Beneficiary* hereof and we warrant our strict compliance therewith. * * *

[Emphasis added]. (Braselton Mot., Ex. G).

10   Aside from the one-page document entitled Trust Agreement, no other evidence was offered that provided reflecting the terms, conditions, or payment for the Trust Receipt between the parties.

11   A "trust receipt" is defined as a "a pre-UCC security device." Black's Law Dictionary (8th ed.

2004). It is considered a "method of financing commercial transactions by which title passes directly from the manufacturer or seller to a banker or lender, who as owner delivers the goods to the dealer on whose behalf the banker or lender is acting, and to whom title ultimately goes when the banker's or lender's primary right has been satisfied." *Id.*

[*31]   The evidence also reveals that shortly after Braselton commenced work on the Project, it submitted an Application for payment, which consisted of a cost for "Bonds and Insurance" with a scheduled value of "$ 257,700.00." (CCISD Mot., Ex. 1). The Project architect certified the Application on November 22, 2004, and the documentation reflects that on December 3, 2004, CCISD issued payment to Braselton for this amount, as well as other charges, totaling $ 289,755.22. (CCISD Mot., Ex.1 & 2). Braselton then issued a check, in the amount of $ 208,788.20, to "The Underwriters Group" to pay for the Trust Receipt. [12] (Braselton Mot., Ex. F). Notably, Braselton acknowledges paying Underwriters from the funds it obtained from CCISD. (Braselton Mot. at 2).

12   *Supra*, note 5.

Based on the evidence presented, this Court concludes that a genuine issue of material fact exists as to who is entitled to the interpleaded funds and can not conclude, as a matter of law, that Braselton, having merely written a check to Underwriters [*32] for the previously issued Trust Receipt, is the owner of those funds. Braselton's contention that CCISD is not entitled to the funds because it was not a party to the Trust Receipt, and the construction Contract did not require the issuance of a Trust Receipt, does not alter the Court's conclusion that there is a genuine issue for trial. Especially considering that, while apparently unknown to CCISD at the time of its issuance, CCISD was expressly named the beneficiary of the Trust Receipt and, as the beneficiary, appears to enure some rights of ownership of the Trust Receipt that include assignment or transfer. (Braselton Mot., Ex. G). Accordingly, Braselton's Motion for Summary Judgment (Instrument No. 30) must be **DENIED.**

### C. CCISD's Motion

In its Motion, CCISD contends that the Court should impose a constructive trust on the funds in its favor because the funds Braselton used to pay the Trust Receipt were wrongfully obtained from CCISD. On this basis, CCISD maintains that the funds belong to it and, as such, summary judgment should be granted in its favor.

Exhibit C-4 Page 220

Texas law recognizes constructive trusts as an equitable remedy "imposed by law because the person holding [*33] the title to property would profit by a wrong or would be unjustly enriched by a wrong or would be unjustly enriched if he were permitted to keep the property." *In re Monnig's Dep't Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991), *quoting from Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 405, 4 Tex. Sup. Ct. J. 12 (Tex. 1960); *see also, Hudspeth v. Stoker*, 644 S.W.2d 92, 94 (Tex.App.-San Antonio 1982, *writ ref'd*) (equitable device imposed by court to prevent unjust enrichment). The party seeking to impose a constructive trust must establish the existence of each of the following elements: (1) actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. *In re Monnig's Dep't Stores, Inc.*, 929 F.2d at 201; *see also, Burkhart Grob Luft und Raumfahrt GmbH & Co. K.G. v. E-Systems, Inc.*, 257 F.3d 461, 469 (5th Cir. 2001).

To establish actual fraud, Texas law requires: (1) the party to be charged made a material misrepresentation that was false; (2) it knew the representation was false *or* made it recklessly as a positive assertion without knowledge of the truth; [*34] (3) it intended to induce the aggrieved party to act on the representation; and (4) the aggrieved party actually and justifiably relied on it. *Ernest & Young, LLP v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577, 44 Tex. Sup. Ct. J. 955 (Tex. 2001).

Even when actual fraud can not be established, a constructive trust may still be applied where there is a showing of constructive fraud. *Meadows v. Bierschwale*, 516 S.W.2d 125, 18 Tex. Sup. Ct. J. 13 (Tex. 1974). To establish constructive fraud there must be an existing or prior confidential relationship. *Panama-Williams, Inc. v. Lipsey*, 576 S.W.2d 426, 432 (Tex.Civ.App.-Houston [1st Dist.] 1978), *aff'd after remand*, 611 S.W.2d 917 (Tex.Civ.App.-Houston [14th Dist.] 1981, *writ ref'd n.r.e.*). However, the mere subjective confidence among business associates is insufficient to establish a confidential relationship exists for purposes of supporting a claim of constructive fraud. *Consolidated Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333, 336, 9 Tex. Sup. Ct. J. 557 (Tex. 1966).

Here, the burden of showing either actual or constructive fraud sufficient to impose a constructive trust on the interplead proceeds rests with [*35] CCISD. *In re Monnig's Dep't Stores, Inc.*, 929 F.2d at 202. The Court must draw all justifiable inferences from the summary judgment evidence in favor of the non-moving party. In reviewing the evidence, the Court finds that the facts and circumstances in this case certainly raise questions concerning the possibility of improper actions, however, no evidence has been proffered to establish either actual or constructive fraud by Braselton so as to

allow the Court to impose a constructive trust on the interpleaded funds in favor of CCISD. The Court observes that in support of its Motion, CCISD includes the affidavit of Ron McPherson, but finds that the affiant's statements are couched only in terms of his beliefs and perceptions of Braselton's knowledge and intent. (CCISD Mot., Exhibit A at P 4). An individual's perceptions or beliefs are insufficient evidence to establish fraud.

Although CCISD also appears to argue that a constructive trust should be imposed by the Court based on mistake (CCISD Mot. at 8), it sets forth no evidence that it paid the money to Braselton based on a mistake. *Contra Cocke v. Pacific Gulf Dev. Corp.*, 594 S.W.2d 545, 548-49 (Tex.App. [Houston-1st. [*36] Dist.] 1980, *no writ*) (constructive trust could be imposed when individual owed an amount, but based on an accounting error mistakenly paid the wrong party).

Therefore, in the absence of any meaningful evidence, the Court declines to find, at this point of the proceedings, that CCISD is entitled to the imposition of a constructive trust in its favor or to summary judgment in its favor with regard to the interpleaded funds. Accordingly, CCISD's Cross Motion for Partial Summary Judgment (Instrument No. 35) is will be **DENIED**.

### III.

### DEFENDANT BRASELTON'S MOTION TO DISMISS

Defendant Braselton seeks dismissal of Defendant CCISD's cross-claims for (1) breach of contract; (2) breach of warranty; (3) deceptive trade practices; (4) fraud and fraudulent misrepresentation; (5) negligent misrepresentation; and (6) indemnification. Braselton contends these claims should be dismissed because the claims do not arise out of the same transaction or occurrence that is the subject matter of the original action or the funds interpleaded to the Court as is required under Rule 13(g) of the Federal Rules of Civil Procedure. (Braselton Mot. [*37] at 6). [13] The Court disagrees. Where an interpleader action was properly brought under Rule 22 and 28 U.S.C. § 1332, the addition of cross-claims will not defeat jurisdiction in the matter. *Travelers Ins. Co. v. First Nat'l Bank*, 675 F.2d 633, 638 (5th Cir. 1982); *see also Zurn Indus. v. Acton Constr. Co.*, 847 F.2d 234, 236-37 (5th Cir. 1988) (once jurisdiction is established over the original action, a court may exercise supplemental jurisdiction over cross-claims brought under Rule 13(g), even in the absence of an independent basis for federal jurisdiction). Claimants may assert "cross-claims against each other, as in any other civil action, assuming, of course, the requirements of Rule 13(g) are met." 7 Wright, Miller & Kane, *supra* § 1715.

Exhibit *C-4* Page 221

13    Also pending before the Court are Braselton's cross-claims against CCISD for breach of contract and claim for quantum meruit. (*See* Braselton Original Answer). However, the Court notes that CCISD has not filed a motion to dismiss these claims and, therefore, they would remain before the Court.

[*38]    Rule 13(g) provides that "[a] pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all of part of a claim asserted in the action against the cross-claimant." Fed. Rule Civ. Proc. 13(g).

"A claim which satisfies the 'transaction or occurrence' test of Rule 13(g) necessarily must be closely related to the original action." *Travelers*, 675 F.2d at 638. More specifically, courts have explained that "[t] he key is the requirement that, for a nondiverse claim to be considered ancillary to a diverse one, it must not only arise from the same 'core operative facts' as does the diverse claim, but it must also bear a 'logical relationship' to that claim." *Id.* (citing, *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978).)

Based on the existing facts in the [*39]    instant case, the Court finds that the cross claims asserted by CCISD against Braselton arise from the same transaction which gives rise to the original claim, clearly comprise an integral part of the original claim–the determination of the owner of the interpleaded funds, and can be determined without a "substantially distinct effort at fact-finding." *Amco Constr. Co. v. Mississippi State Building Comm'n*, 602 F.2d 730, 733(5th Cir. 1979). Moreover, given the facts of the case, the Court concludes it necessary to decide the proposed cross-claims to "protect the integrity of the original claim or to insure that the disposition of the original claim would not have been frustrated." *Travelers*, 675 F.2d at 638 (*citing, Amco Constr.*, 602 F.2d at 733).

Finally, even if the cross-claims arise out of the same transaction, Braselton urges the Court to decline to exercise supplementary jurisdiction over CCISD's cross-claims because the cross-claims "clearly raise complex State issues" and would "predominate over the single issue of the determination of the parties' respective rights to the interpled funds." (Braselton Mot. at 12). 28 U.S.C. § 1367(c)(a) [*40]    . The Court respectfully disagrees. Having reviewed the pleadings and evidence submitted in this case, the Court finds that the State claims asserted by CCISD in its cross-claim raise neither novel nor complex issues of State law. Further, the Court is not inclined to conclude that the cross-claims will predominate over the determination of the issue of to whom the funds belong. Instead, the facts and circumstances presented thus far in this case lead the Court to conclude that the cross-claims are so inextricably intertwined with the determination of ownership of the funds that it would only be proper to adjudicate these claims together as they all arise out of the same transaction or occurrence. The Court, therefore, sees no basis to decline supplemental jurisdiction of the cross-claims in this case under 28 U.S.C. § 1367(c)(a). Accordingly, Braselton's Motion to Dismiss CCISD's Cross-Claims (Instrument No. 30) must also be **DENIED**.

## CONCLUSION

Accordingly, for the foregoing reasons, Underwriters' Motion for Summary Judgment (Instrument No. 37), is **GRANTED** to the extent it seeks declaratory judgment that it has no further liability or [*41]    obligation to Defendants, but its request for attorney fees and costs is, at this point, **DENIED**. To the extent that Underwriters seeks dismissal in its Motion, this request is **GRANTED**, but **DEFERRED** until such time as the Court issues a determination regarding its request for attorney fees and costs.

It is further **ORDERED** that Braselton's Motion for Summary Judgment (Instrument No. 30) is **DENIED**; Braselton's Motion to Dismiss the Cross-Claims is **DENIED** (Instrument No. 30); and Defendant CCISD's Cross-Motion for Summary Judgment (Instrument No. 35) is **DENIED**.

Following the issuance of a Supplemental Order and Judgment, the Court will issue a Scheduling Order in this case.

**DONE** at Galveston, Texas, this 30th day of June, 2006.

John R. Froeschner

United States Magistrate Judge

Exhibit C-4 Page 222